# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Terry Metcalf,** *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 07-1839 (RMC)** |
| | ) |
| **Donald C. Winter,** *et al.* | ) |
| **Secretary of the United States Navy** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

The Defendant, through counsel, the United States Attorney for the District of Columbia, respectfully submits the following memorandum in opposition to Plaintiffs' Motion for Temporary Restraining Order. Defendants submit that Plaintiffs can establish neither irreparable harm nor likelihood of success on the merits.

**I.    Introduction.**

Plaintiffs, Terry Metcalf and his company, Metcalf Construction Company, Inc., file this lawsuit under the Administrative Procedure Act seeking to set aside the Debarring Official's decision to debar them from participating in federal government procurement programs. Plaintiffs allege harm from their consequent inability to compete for non-federal contracts in Hawaii. Defendants submit that any claimed connection between Plaintiffs' federal debarment and non-federal contracts is speculative at best, and that any other claimed harm is not irreparable. Moreover, Plaintiffs are not likely to succeed on the merits since the debarring official acted properly in finding that Plaintiffs should be debarred.

## II.     Background.

Defendants rely on the attached September 4, 2007 Letter of Debarment and Memorandum for the Department of the Navy Suspending and Debarring Official in support thereof, attached as Exhibit 1 hereto, which sets forth the factual and procedural background for the debarment at issue in this case.

## III.     Argument.

### A.     The Debarment: Plaintiffs Have Failed To Satisfy the Standards For Issuance of Injunctive Relief.

#### 1.     Plaintiffs Bear a Heavy Burden to Justify the Grant of Preliminary Injunctive Relief

It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it has a substantial burden of proof.  American Coastal Line Joint Venture v. United States Lines, Inc., 580 F. Supp. 932, 935 (D.D.C. 1983); see Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1208 (D.C. Cir. 1989); Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958).  To be entitled to the extraordinary remedy of injunctive relief,  plaintiffs must meet this strict burden by showing that: (1) there is a substantial likelihood of their prevailing on the merits of their claims; (2) a preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury to the plaintiff outweighs the possible harm to others; and (4) the public interest favors issuance of the injunction.  Sea Containers, 890 F.2d at 1208; Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Virginia Petroleum, 259 F.2d at 924-25.  These factors "interrelate on a sliding scale and must be balanced against each other. 'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'" Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C.

Cir. 1999), quoting CifiFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir.1985). To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." Id. The burden is particularly difficult to meet in the procurement context, which is analogous to this debarment case, where the courts consistently hold that agency discretion must be given particular force. E.g., Sea-Land Serv., Inc. v. Brown, 600 F.2d 429, 434 (3d Cir. 1979); M. Steinthal & Co. v. Seamens, 455 F.2d 1289, 1301, 1304 (D.C. Cir. 1971).

Applying this standard in this case plainly reveals that Plaintiffs are not entitled to preliminary injunctive relief. Not only have they failed to demonstrate a substantial likelihood of success on the merits, but they have also failed to show the existence of any genuine irreparable harm or that they have no adequate remedy at law. Consequently, for the reasons outlined below, Plaintiffs' Motion for Temporary Restraining Order should be denied.

### (2). <u>Plaintiffs Cannot Demonstrate Likelihood of Success on the Merits.</u>

#### (a) <u>Debarment and  the Federal Acquisition Regulations</u>

The Federal Acquisition Regulations (FAR), permit an agency to exercise discretion, for cause, to prohibit a contractor from bidding on government contracts or subcontracts for a period generally not to exceed three years. 48 C.F.R. § 9.402(a) (noting that "debarment and suspension are discretionary actions."); 48 C.F.R. § 9.406-4 (noting that a debarment is not to exceed three years). This sanction of "debarment" is to be imposed "only in the public interest for the Government's protection and not for purposes of punishment." 48 C.F.R. § 9.402(b).

The FAR provides, in pertinent part, that "[a]gencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only." FAR 9.402 (a). The FAR further provides that "[d]ebarment and suspension are discretionary actions that, taken in accordance with this subpart, are appropriate means to effectuate this policy." Id. The FAR also mandates that in order to "be determined responsible, a prospective contractor must . . . [h]ave a satisfactory record of integrity and business ethics." FAR 9.104.1 Under the FAR, the debarring official may debar –

> (c) A contractor or subcontractor based on any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor or subcontractor.

FAR 9.406-2(c). The FAR permits an agency to impute to a contractor the "seriously improper conduct of any officer, director, shareholder, partner, employee, or other individual associated with [the] contractor ⋯ when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval, or acquiescence." 48 C.F.R. § 9.406-5(a).

An agency proposing debarment must "afford the contractor ⋯ an opportunity to submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment." 48 C.F.R. § 9.406-3(b). Otherwise, if the debarment decision is based on a conviction, the agency may make a decision on the basis of all information in the record, including any information submitted by the contractor. 48 C.F.R. § 9.406-3(d).

(b).  Standard of Review

Judicial review of The Debarring Official's decision to debar Plaintiffs from participating in government procurement programs is very limited. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious,

4

an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A). This review is "highly deferential," and the Court "must presume the validity of agency action." Kisser v. Cisneros, 14 F.3d 615, 618 (D.C. Cir. 1994), citing American Horse Protection Ass'n, Inc. v. Yeutter, 917 F.2d 594, 596 (D.C. Cir. 1990); see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (court's role in determining whether governmental action is arbitrary, capricious, or an abuse of discretion is a narrow one). The Court may make inquiry only into whether the decision maker considered "relevant factors and whether there has been a clear error of judgment . . . [however,] the court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) ; see also Kisser, 14 F.3d at 619. If the Court finds a reasonable basis for the agency's action, the Court must affirm that action even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the regulation or standard at issue. See Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 204 (D.C. Cir. 1984).

(c)  Evidence Supporting The Debarring Official's Decisions

**Facts Used as a Basis for the Debarment**

Contrary to Metcalf's arguments, the Navy used only the four facts articulated in its letter of 23 August 2007 (attached as Exhibit 2) and again identified in its memorandum recommending debarment of 4 September 2007 as the basis for debarment. As stated in those documents, all other issues were excluded from the final responsibility analysis. The rationale for their exclusion is discussed in detail in the memorandum recommending debarment. The four facts used as the basis for the debarment, all of which are conceded by Metcalf in its pleadings and in earlier correspondence with the Navy throughout the debarment process, are as follows:

1.      In its "Revised Worksheet for REA 16 & 17/ Itemized Back up for # 1 - 12" dated 27 October 2006, Metcalf submitted several hundred pages of documents as support for $453,624 under Line Item #1.  Contrary to Metcalf's assertion that "Metcalf did not submit PCs 33 and 35 and related invoices in support of Line Items 1 and 2."  (emphasis in original) (Symon letter of 6 June 2007, p. 5), $107,511 of this amount was based on invoices previously paid by the Government under bilateral contract modification A00019.

Although Metcalf repeatedly emphasizes that these incidents of double billing were a mistake and of a low dollar value relative to the total value of the claim, the Court should be aware that Metcalf submitted nearly 700 pages of supporting documentation for its claim.  Of this total, almost 250 pages (more than one-third) of the documents were submitted as support for Line Item #1.  Out of nearly 250 pages of support for Line Item #1, more than 150 pages relate solely to work that Metcalf agrees was previously paid under bilateral contract modification A00019.  Metcalf's inclusion of these documents was pointed out to Metcalf in the Resident Officer in Charge of Construction (ROICC) response in January 2007 and the proposed debarment in May 2007. Nevertheless, Metcalf continued to assert that it had "conducted an in-depth review of the damages submitted in the REA" and that "Metcalf did not submit PCs 33 and 35 and related invoices in support of Line Items 1 and 2."  (emphasis in original) (Symon letter of 6 June 2007, p. 5) and continued to include these costs in its certified claim.   The Navy sent Metcalf a complete copy of its submission with yet another opportunity to revise its position in July 2007, and Metcalf again indicated that it did not wish to change its position.  The Navy sent Metcalf an extremely detailed identification of Metcalf's own documents in the Declaration of Orlino Peralta on 23 August 2007 (attachment to Exhibit 2).  Apparently, it was only after reading this detailed and conclusive Navy analysis that Metcalf conceded it had in fact double billed these costs in its REA and certified claim.

In Metcalf's Complaint, Metcalf states after receiving this Declaration, it initiated an investigation into the record and determined that it had included $107,511 of costs related to work already paid by the Navy in its REA. However, Metcalf did not inform the Navy of its investigation until it filed the Complaint yesterday. Metcalf now claims that inclusion of over 150 pages of documentation of work that had already been paid by the Navy in its REA and inclusion of the associated costs in its certified claim, the fact of which had been repeatedly pointed out to Metcalf over the preceding nine months, was a "mistake." Metcalf does not dispute that it did in fact double bill the Navy for this amount.

2.      Submission of KEI invoice 26-04 in connection with Line Item #2, which Metcalf concedes was previously paid under contract modification A00019.

Metcalf conceded this incident of double billing in its MIO submitted on 6 June 2007 and continues to concede in its Complaint (p.8).

3.      Submission of KEI invoices 26-30 (dated 3 May 2006) and 26-40 (dated 15 June 2006), both of which include the same 38 hours of work by Tony Barnard performed during May 2006.

Metcalf conceded this incident of double billing in its MIO submitted on 6 June 2007 and continues to concede in its Complaint (p.8).

4.      Submission of attorneys' fees and expenses in connection with Line Item #12 that Metcalf concedes are unrelated to the object of the REA.
Metcalf conceded this submission of unrelated costs in its MIO submitted on 6 June 2007 and continues to concede in its Complaint (p.8).

Throughout its pleadings, Metcalf argues against the findings in the memorandum recommending proposed debarment, which are summarized in the memorandum recommending debarment. Metcalf does not recognize or acknowledge the fact that the material it mischaracterizes as the Navy's findings in the debarment were actually the findings in the proposed debarment only. The Navy narrowed the scope of its responsibility analysis in its debarment decision as a result of

thorough consideration of the Matters in Opposition (MIO) presented by Metcalf as well as review of the complete submission made by Metcalf in connection with the REA. The Navy notified Metcalf of the limited scope of the responsibility analysis in its letter of 23 August 2007 and provided a detailed review of its analysis in the memorandum recommending debarment. Only those causes that actually form the basis for the Government's action (here, the debarment decision) are subject to challenge.

### Legal Basis for Debarment

As a preliminary matter, Defendant addresses Metcalf's contention that the debarment is legally improper because "a debarment proposed pursuant to FAR 9.406-2(c) can only be proposed based on factors that have not already been covered by FAR 9.406-2(a) & (b)." (Symon letter of 6 June 2007, pp. 3-4) This assertion is contrary to case law and fundamentally flawed. Following Metcalf's argument to its logical conclusion, no federal agency would ever be able to protect itself against non-responsible contractors who continually commit crimes against the federal Government and may even admit to doing so, simply because no court has rendered judgment against them.

The Fourth Circuit has specifically addressed this issue in the context of a contractor's argument that it could not be debarred under FAR 9.406-2(c) for collusive bidding absent a conviction or civil judgment. Leitman v. McAusland, 934 F.2d 46, 50-51 (4th Cir. 1991). The contractor argued that the existence of a specific grounds for debarment under FAR 9.406-2(a)(2) prohibited debarment under FAR 9.406-2(c) for the same cause. The court disagreed, stating that the purpose of the alternate causes for debarment under FAR 9.406-2(a) & (c) is that subsection (a) allows for debarment without any opportunity for a hearing. Id. The court found that:

> This statutory structure and the language of the regulations clearly do not
> envision a requirement that a conviction or civil judgment be obtained before a
> debarment proceeding based on collusive bidding agreements be initiated

Id. The same reasoning applies in the current case. Had Metcalf been able to identify a genuine

dispute of material fact, it would have been entitled to a hearing because it has not been convicted,

and no civil judgment has been rendered. If Metcalf had been subject to a conviction or civil

judgment, it would have no entitlement to a hearing regardless of what facts it might dispute and

regardless of what evidence it might present in support of its position. As the Court found in

Leitman, this distinction in the rights of a contractor proposed for debarment is the purpose of the

structure of the regulations.

**Administrative Standard of Review**

In accordance with FAR 9.406-3(d)(3), the cause for debarment must be established by a

preponderance of the evidence. Despite Metcalf's selective quoting of phrases from the

memorandum recommending debarment, the Navy did use the appropriate standard and did consider

all relevant evidence. Given that Metcalf explicitly concedes every fact used as a basis for the

debarment, and given that it was the Navy's analysis of Metcalf's own documents that convinced

Metcalf of the merit of the Navy's position, Metcalf cannot now credibly argue that the cause was

not supported by a preponderance of the evidence.

The undisputed facts are that Metcalf submitted costs in both its REA and in its certified

claim that were previously paid by the Navy under a bilateral contract modification. While the FAR

provisions on Defective Cost or Pricing Data recognize that contractors may submit data that is

"inaccurate, incomplete, or noncurrent" (FAR 15.407-1), there is no provision that allows for

submission of data for costs that have already been paid, nor does it contemplate a 700-page

9

submission of which more than 150 pages represent work that has previously been paid by the Government.

Further, Metcalf affirmatively represented to the Government that it would correct at least one of these duplicate billings contained both in the REA and in the certified claim in its submission on 6 June 2006. Three months elapsed between that representation and the Navy's debarment of Metcalf, and at that time Metcalf had still not corrected the certified claim to remove double billing that it had specifically acknowledged and represented that it would correct. Note that the eighteen month period of debarment was set with an explicit statement that the period was determined giving Metcalf the benefit of the doubt that it would in fact make the necessary corrections within a reasonable time.

## Metcalf Received Due Process Through the Debarment Proceedings

As stated above, Metcalf agrees with the Navy on each of the facts underlying the debarment. Although Metcalf argues that due process was not served without an opportunity to hold a hearing on "material issues," the regulations governing debarment only allow for a hearing to conduct fact-finding when there is a genuine dispute over material fact. Because Metcalf did not raise a genuine dispute over material fact, and in fact explicitly states in its Complaint that it agrees with all of the material facts that form the basis for the debarment, fact-finding was not appropriate under the regulations as explained to Metcalf in the Navy letter of 23 August 2007. Where the Government and the contractor agree on the facts that led to the eventual debarment of the contractor, the Court has held that it "cannot conclude that [the Government] abused [its] discretion by refusing to grant a fact-finding hearing." Mobley v. Cheney, 1990 WL 141750 (D.D.C. 1990). The Court has also

found that a hearing is required only to establish the facts, not to resolve a dispute over the interpretation of the facts.  Koehler v. United States, 1990 WL 292493 (D.D.C. 1990).

Despite Metcalf's failure to articulate a genuine dispute over material fact with respect to the submission of documents related to previously paid work in connection with Line Item #1, the Navy again specifically pointed these documents out to Metcalf and offered it one last opportunity to respond.  Under DFARS Appendix H-104, had Metcalf's MIO identified a genuine dispute over material fact, the regulations state that a fact-finding proceeding should be scheduled within forty-five working days of receipt of Metcalf's MIO.  The 28 June 2007 MIO submission was the last submission prior to Metcalf's formal statement that it had no additional information to submit on 6 August 2007.  With 45 working days having elapsed from receipt of the 28 June 2007 MIO, Metcalf still having failed to articulate a genuine dispute over material fact, and having head nothing from Metcalf almost two weeks after denying the request for a fact-finding proceeding, the Navy made its debarment decision.  The Navy's good faith in processing this debarment action is obvious in allowing multiple submissions of MIO and multiple opportunities to revise its position, correct its submissions, follow through on its representations, and comment on the administrative record.  The Navy afforded Metcalf all due process to which it was entitled

In the memorandum recommending debarment, the Navy considered thoroughly all relevant information in the law and administrative record.  The Navy addressed the background information, findings of the proposed debarment (pp.2-3), Metcalf's Matters in Opposition, request for a fact-finding proceedings, additional information used by the Navy, and the legal basis for the debarment.  The Navy then articulated its Findings and Analysis of the Administrative Record and MIO (pp. 9-11), including analysis of Metcalf's overarching arguments as well as detailed analysis

11

of each of the six examples from the proposed debarment that were addressed in the MIO.   The Navy further conducted a Debarment Analysis of the applicable regulations, including consideration of the severity of the misconduct and point-by-point analysis of each mitigating factor set forth in FAR 9.406-1(a).

In its MIO, Metcalf asked the Navy to review the merits of the certified global claim and request for final decision.  Regardless of the merits of the claim, the Navy's review was only concerned with the supporting documentation submitted by Metcalf in connection with the REA and whether that information supports a cause for debarment.  The certified claim is relevant to the analysis only to the extent that items that are double billed in the REA are included in the certified claim, and in consideration of items that Metcalf affirmatively stated it would remove from the certified claim because of double billing.  In its MIO, Metcalf said that it had conducted a thorough review of damages subsequent to the REA and that it is now represented by experienced counsel to guide it through the claim process.  Despite all of these representations by Metcalf, at the time of the debarment decision, Metcalf had not submitted a revised certified claim or withdrawn any damages from consideration subsequent to discovery of its "mistakes."  Since January 2007, Metcalf has been aware of and subsequently admitted to several items that were double billed under the REA and under the certified claim, yet many months passed before Metcalf removed any of these items from consideration in the certified claim.  Regardless of the value of those items, Metcalf's failure to follow through with its affirmative statements to the Government that it would remove double billed costs calls into question its responsibility as a Government contractor.

**(3) Plaintiffs Cannot Establish Irreparable Harm.**

Plaintiffs have not shown that they will suffer irreparable harm absent injunctive relief. To warrant the extraordinary relief of reversing Plaintiffs' debarment during the pendency of this lawsuit, Plaintiffs must demonstrate that they are being irreparably harmed. Beacon Theatres v. Westover, 359 U.S. 500, 506-07 (1959); see also Rondeau v. Mosinee Paper Corp., 422 U.S. 49 (1975).

Plaintiffs assert that the harm is two-fold. First, they claim that their "ability to function as an ongoing business on state and federal public contracts will be thwarted." TRO Motion at 2. However, as a matter of law, monetary loss is not irreparable harm unless it threatens the very existence of the Plaintiffs' business. The law is well settled that "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." Sampson v. Murray, 415 U.S. 61, 90 (1974). "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." Wisconsin, 758 F.2d at 674; see also Vencor Nursing L.P. v. Shalala, 63 F. Supp. 2d 1 (D.D.C. 1999) (monetary loss alone accorded little or no weight in analyzing irreparable harm); Nichols v. A.I.D., 18 F. Supp. 2d. 1 (D.D.C. 1998) (loss of job and salary without more insufficient to demonstrate entitlement to injunctive relief). It seems that Plaintiffs hedge quite a bit and do not actually allege a risk to all of their business operations.

Plaintiffs further argue that they have been unable to "bid on several federal and state construction projects and will be unable to bid on future federal and state construction projects." TRO Motion at 2. But, even if Metcalf remains debarred, it is not foreclosed from maintaining its current contracts or procuring future ones if "the agency head or a designee . . . states in writing the compelling reasons justifying continued business dealings between the agency and the contractor."

48 C.F.R. § 9.406-1(c). Metcalf has not shown that it could not get the agencies with whom it has contracts to apply this exemption. Moreover, Metcalf cannot establish that their entire business operations are at risk because of the debarment. Under these circumstances, Metcalf cannot demonstrate irreparable harm.

**(4)  The Government Will Be Harmed by the Preliminary Injunction Sought.**

In contrast to the harm alleged but not substantiated by Plaintiffs, the government faces real and substantial harm if the Plaintiffs' debarment is set aside by the Court. Federal agencies are under a statutory duty to do business with responsible contractors. 48 C.F.R. § 9.402 (noting that "[a]gencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors.") (emphasis added); see also Robinson, 876 F.2d at 159 (noting that "the Government must be able to fulfill its statutory duty of dealing only with responsible contractors.") (emphasis added). One of the federal government's most valuable tools in fulfilling this obligation is its power to debar or suspend nonresponsible government contractors. See Gonzales v. Freemen, 334 F.2d at 576-77 (federal government has a strong interest in refusing to deal with companies or individuals when it believes they lack responsibility). The importance of ensuring that the government deals only with responsible individuals and the role of debarment and suspension in providing that assurance has been explained by the D.C. Circuit:

> The federal acquisition regulation system operates on the assumption that all individuals with whom the government does business are persons of integrity who abide by the terms of their government contracts. The security of the United States, and thus of the general public, depends upon the quality and reliability of items supplied by these contracts. When items enter the supply system through fraud or deceit, the national security, public welfare, and personal safety are all potentially compromised and endangered. . . . Debarment reduces the risk of harm to the system by eliminating the source of that risk, that is, the unethical or incompetent contractor.

<u>Caiola v. Carroll</u>, 851 F.2d 395, 398-99 (D.C. Cir. 1988).

The governing inquiry in this debarment is whether Plaintiffs are "presently responsible" and trustworthy to continue to serve federal contracts. The determination to debar Plaintiffs turns on their integrity and trustworthiness. A contractor's responsibility and integrity in the context of government procurement law relates to matters of integrity or business ethics as well as the individual's ability to successfully complete a contract. <u>See</u> <u>Roemer v. Hoffman</u>, 419 F. Supp. 130, 131 (D.D.C. 1976). Defendants' regulations regarding suspensions and debarments are carefully crafted to protect these values: they provide for sanctions only upon adequate evidence of improper conduct after notice and an opportunity to be heard. <u>See</u> 48 C.F.R. §§ 9.406-2 and 9.406-3. To compel the government to contract with Plaintiffs in the face of virtually undisputed evidence that Metcalf double billed and failed to address it, until after the fact, despite being advised of it.

**(5) The Public Interest Favors Maintaining the Debarment.**

The final factor weighing against granting the extraordinary relief sought by Plaintiffs is the public interest. The public interest at stake in this matter is closely aligned with the government's interest in ensuring that the government does business exclusively with responsible contractors. <u>See</u> 49 C.F.R. § 9.402. The federal government (and through it the federal taxpayers) has no assurance that Terry Metcalf or Metcalf Construction will not commit future misdeeds. The public will bear the burden of paying for the consequences if Metcalf repeats its misdeeds.

**IV.    Conclusion.**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____
OLIVER W. McDANIEL, D.C. Bar #377360
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 616-0739

Attorneys for Defendant

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of October, 2007, I caused the foregoing Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order to be served on Counsel for the Plaintiff sby the Electronic Case Filing system or, if this means failed, then by first-class mail, postage prepaid, addressed as follows:

Robert J. Symon, Esq.
Jeremy Becker-Welts, Esq.
Bradley Arant Rose & White, LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, D.C.  20036


_____/s/_____
OLIVER W. McDANIEL, D.C. BAR # 377360
Assistant United States Attorney
Civil Division
555 Fourth St., N.W.
Washington, D.C.  20530
(202) 616-0739

EXHIBIT 1



**DEPARTMENT OF THE NAVY**
OFFICE OF THE GENERAL COUNSEL
720 KENNON STREET SE RM 214
WASHINGTON NAVY YARD DC 20374-5012

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Robert J. Symon, Esq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, DC 20036

     RE:    DEBARMENT OF METCALF CONSTRUCTION COMPANY, INC. AND
            TERRY METCALF, CEO/PRESIDENT, METCALF CONSTRUCTION
            COMPANY, INC.

Dear Mr. Symon:

     On 1 May 2007, Metcalf Construction Company, Inc. (MCCI) and Terry Metcalf, CEO/President, MCCI were proposed for debarment from contracting with any agency in the Executive Branch of the Federal Government. In the letter notifying MCCI and Mr. Metcalf of that fact, they were also notified of their right to present information and argument in opposition to the proposed debarment within thirty days of receipt of that notice. You submitted matters in opposition and other information for my consideration on 10 May 2007, 6 June 2007, 26 June 2007, 27 June 2007, 28 June 2007, 6 August 2007, and 15 August 2007. I have reviewed your matters in opposition and have made my determination with that information in mind.

     On behalf of the Department of the Navy, I am debarring MCCI and Mr. Metcalf effective as of the date of this letter. Based upon my review of the entire Administrative Record, which includes the enclosed "Memorandum for the Department of the Navy Suspending and Debarring Official," I find the facts to be as stated in the enclosed Memorandum, and I further find that the facts support causes to debar MCCI and Mr. Metcalf. The causes and reasons for these actions are also stated in the Memorandum, which I adopt and incorporate herein by reference.

     I have decided that a period of debarment is necessary to protect the Government's interests. The debarment is effective immediately and continues through 31 October 2008. This period of debarment includes credit given for the period of exclusion from contracting with the Government resulting from MCCI and Mr. Metcalf's proposed debarment.

     As a debarred contractor, MCCI and Mr. Metcalf are excluded from receiving new contracts, and contracting officers are precluded from giving their consent if MCCI or Mr. Metcalf are proposed as a subcontractor for any subcontract subject to Government consent, unless the head of the agency taking the contracting action, or a designee, determines that there is a compelling reason for such action. Further MCCI and Mr. Metcalf are excluded from conducting business with the Government as an agent or representative of other contractors. MCCI and Mr. Metcalf are also excluded from participating in Federal nonprocurement activities such as programs and activities involving Federal financial and nonfinancial assistance and

benefits. The foregoing notwithstanding, agencies may continue contracts or subcontracts in existence as of the effective date of debarment.

Sincerely,

MARK O. WILKOFF
Suspending and Debarring Official
Department of the Navy

Date: 9/4/07

Enclosure



**DEPARTMENT OF THE NAVY**
OFFICE OF THE GENERAL COUNSEL
720 KENNON STREET SE RM 214
WASHINGTON NAVY YARD DC 20374-5012

4 September 2007

MEMORANDUM FOR THE DEPARTMENT OF THE NAVY
SUSPENDING AND DEBARRING OFFICIAL

Subj:    DEBARMENT OF METCALF CONSTRUCTION COMPANY, INC. AND TERRY
METCALF, CEO/PRESIDENT, METCALF CONSTRUCTION COMPANY, INC.

<u>BACKGROUND</u>

On 20 September 2006, Terry Metcalf, CEO/President, Metcalf Construction Company,
Inc. (MCCI) submitted a certified Consolidated Request for Equitable Adjustment (REA) to the
Resident Officer In Charge of Construction (ROICC), Marine Corps Base Hawaii. The REA
requested approximately $5.2M, excused delay of 123 calendar days and 88 compensable work
days based on a differing site condition. The ROICC responded to the REA with a determination
dated 23 January 2007 (ROICC Determination), finding that MCCI was entitled to $101,434 and
that the remaining $5.1M requested was not compensable. On 5 April 2007, the Contracting
Officer issued a unilateral modification to the contract constituting the Contracting Officer's
determination that MCCI was entitled to $101,434 and increasing the contract price by that
amount.

On 1 May 2007, the Department of the Navy Suspending and Debarring Official (SDO)
proposed MCCI and Terry Metcalf for debarment based upon the REA and numerous instances
of double billing and submission of clearly non-compensable items in the REA. MCCI and
Terry Metcalf, through their outside counsel, submitted Matters in Opposition (MIO) to the
proposed debarment on 10 May 2007, 6 June 2007, 26 June 2007, 27 June 2007, 28 June 2007, 6
August 2007, and 15 August 2007.

<u>INFORMATION IN THE RECORD</u>

MCCI is the prime contractor for N62742-02-C-1313. The current total contract price is
$50,274,633. Under the contract, MCCI is required to design and build 212 family housing units
at Marine Corps Base Hawaii, Kaneohe Bay, Hawaii. MCCI is responsible for soil sampling and
removal of contaminated soils. During performance of the contract, soil sampling revealed
chlordane in the topsoil. Due to a change in available soil disposal sites during contract
performance, the Contracting Officer executed unilateral modifications A00016 and A00017 to
compensate MCCI for delays and costs associated with the discovery and disposition of the
chlordane contaminated soil. Under these modifications, MCCI received $602,914 and 63
calendar days (including 45 work days with extended overhead.)

MCCI submitted initial requests for equitable adjustment for excess costs in performing the additional work under modifications A00016 and A00017 on 2 December 2005 and 20 January 2006 respectively. MCCI submitted its Consolidated Request for Equitable Adjustment (REA) on 20 September 2006, with supplemental documentation subsequently provided to the ROICC. The REA asserts a differing site condition under FAR 52.236-2 and requests additional funding in the amount of $5,214,761 plus 123 calendar days (including 88 compensable work days). The REA asserts that all claimed costs and delays are associated with modifications A00016 and A00017. The REA includes the certification required by DFARS 252.243-7002:

> I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief.

Terry Metcalf, CEO/President of MCCI, signed both the certification and the REA.

MCCI supplemented the REA with a "Revised Worksheet for REA 16 & 17/Itemized Back up for # 1 – 12" dated 27 October 2006. This submittal was signed by James Oellien, Project Manager, MCCI, and received by the ROICC on 30 October 2006. MCCI submitted additional supporting documents by transmittal of "Revised Worksheet for REA 16&17: Itemized Back up for # 13 – 21" dated 28 November 2006 and received by the ROICC that same day.

The ROICC conducted a thorough analysis of the REA and MCCI's supporting documentation, as set forth in his determination dated 23 January 2007. The ROICC determined that two of the twenty six cost/delay line items submitted by MCCI were partially compensable. The remaining cost/delay line items were denied in their entirety. The majority of the line items denied by the ROICC, as outlined in the ROICC Determination, were rejected based on his determination that MCCI had already been compensated for the work/delays under the contract and modifications A00003, A00016, A00017, A00019, and A00022. Other items were denied on the grounds that the supporting data provided by MCCI was wholly unrelated to modifications A00016 and A00017 or due entirely to MCCI's poor planning and decision-making.

PROPOSED DEBARMENT

Based upon the ROICC analysis, the REA, and the relevant contract modifications, the Navy proposed MCCI and Terry Metcalf for debarment on 1 May 2007. The memorandum recommending that MCCI and Terry Metcalf be proposed for debarment discussed the ROICC's findings, as implemented by the contracting officer, and highlighted six examples of double billing and submission of clearly non-compensable costs:

1. MCCI submitted Proposed Contract Modifications (PC) 33 and 35 and related invoices as supporting data for Line Items #1 and #2. Both of these PCs were previously negotiated and paid under bilateral modification A00019.

2. MCCI submitted KEI invoices 26-30 and 26-40 as supporting data for Line Item #4. Each of these invoices includes payment for 38 hours of work by Tony Barnard (Site

2

Safety Health Officer) during the same work days from 1 – 11 May 2006. Not only does this constitute double billing for Mr. Barnard's time on those days, but MCCI is required under the contract to provide a full-time SSHO. Therefore, MCCI cannot request *any* additional funds for SSHO services under the contract, let alone double billing for additional services. Further, SSHO services are wholly unrelated to modifications A00016 and A00017, the subject of the REA.

3. MCCI requested attorney costs for the modifications and compliance with EPA regulations as part of Line Item #12. The modifications were unilateral and did not involve negotiations with MCCI counsel. MCCI is required under the contract to comply with all environmental regulations. Further, MCCI provided no invoices or supporting documentation for this line item.

4. MCCI requested $825,743 for a "site electrical delay" in Line Item #16. MCCI provided as supporting documentation a subcontractor invoice including 751.11 labor hours that were previously paid under modification A00003. Under modification A00003, MCCI received $585,565 for relocating electrical circuit 104.

5. MCCI requested delay impact costs for subcontractor Dorvin Leis in Line Item #21. Dorvin Leis claimed it was delayed by 123 calendar days, but the ROICC records showed that the subcontractor was actually working during this time. Further, the ROICC previously negotiated and compensated MCCI for delays during this time period through bilateral modification A00022.

6. MCCI requested delay impact costs for subcontractor Goodfellow Bros. Inc. (GBI) in the amount of $817,154 in Line Item #25. The ROICC confirmed with on-site government personnel and through daily reports that GBI was working on site at all times since June 2005. There was no delay.

After reviewing the Administrative Record, the SDO determined that the facts provided the requisite evidence to propose MCCI and Terry Metcalf for debarment for the cause stated in FAR 9.406-2(c). The SDO found that MCCI submitted an REA in which more than 98% of costs claimed were unsupported, based on factual inaccuracies, unrelated to the subject of the REA, or constituted double billing for work already paid and/or required by the contract. Terry Metcalf signed the certification and REA, representing that MCCI was entitled to this money under the contract and applicable law. Whether the double billing contained in the REA was the result of fraud by MCCI and Terry Metcalf, or the result of Terry Metcalf's inability to comprehend and adhere to applicable law, MCCI's REA and its pursuit of over $5M in non-compensable costs call into question its responsibility, honesty, and credibility as a contractor.

MATTERS IN OPPOSITION AND MITIGATION

MCCI made several submissions in response to the proposed debarment on 10 May 2007, 6 June 2007, 26 June 2007, 27 June 2007, 28 June 2007, 6 August 2007, and 15 August 2007. MCCI, through its outside counsel, also met with the SDO on 26 June 2007. At its meeting with the SDO, MCCI provided a history of its interactions with the Navy on this contract and a binder

of materials relating to the contract, including a bid protest suit, a copy of the Global Certified Claim (without supporting documentation), deposition testimony of LCDR Lance Lee in a separate proceeding, MCCI's 6 June 2007 submittal, a timetable of chlordane issues, and FAR provisions.

The following are summaries of the overarching arguments made by MCCI in its first two submissions:

1. MCCI suggests that the SDO consider the merits of MCCI's subsequent certified global claim and request for final decision.

2. The proposed basis for the debarment is legally improper. MCCI argues that:

   [U]sing a false claim as a basis for debarment can only be effected through FAR 9.406-2(a), which requires a prior judicial determination before debarment can occur. Attempting to use Subsection (c) impermissibly avoids the safeguards built into Subsection (a). . . In other words, we submit that a debarment proposed pursuant to FAR 9.406-2(c) can only be proposed based on factors that have not already been covered by FAR 9.406-2(a) & (b). (Symon letter of 6 June 2007, p. 4)

3. The proposed debarment contained erroneous findings of fact and the SDO should conduct an independent inquiry into the REA.

4. MCCI was not aware of several "mistakes" it had made in submitting supporting documentation for the REA until it received the ROICC analysis. Since that time, MCCI has conducted an in-depth review of the damages submitted in the REA. MCCI did not provide a detailed analysis or report summarizing the review.

5. MCCI submitted the following for consideration in connection with the seriousness of its alleged acts and mitigating factors: (a) that the REA process "allows for the opportunity for a contractor and the government to informally discuss and negotiate issues (or perceived issues) arising under contract performance," (b) that MCCI cooperated with the government during the pendency of the REA, (c) that the government did not negotiate with MCCI over the REA, and (d) that MCCI is not a sophisticated government contractor and that it put together the REA on its own, but is now represented by counsel and "such a measure provides a higher level of assurance that the type of conduct that occurred at the REA level will not recur." (Symon letter of 6 June 2007, pp. 10-11)

6. MCCI "is a contractor presently responsible and well-qualified to do business with the U.S. government as well as the State of Hawaii" and completed contract performance "at a cost of millions of dollars beyond the contract price." (Symon letter of 6 June 2007, p. 11)

In each of its June 2007 submissions, MCCI provided specific argument and supporting information with respect to the six examples highlighted in the proposed debarment memorandum. The arguments are summarized below.

### Line Item # 1 – Remove 6 stockpiles as directed in Mod 00016
### Goodfellow Bros. Inc.
### ($453,624.00)

"Metcalf did *not* submit PCs 33 and 35 and related invoices in support of Line Items 1 and 2." (emphasis in original) (Symon letter of 6 June 2007, p. 5)  MCCI argues that the GBI force account reports submitted as supporting documentation are for PC 31 only, i.e. stockpiles #10, 11, 14, 15, 18, and 20.  They are not for the stockpile in the middle of street "H" (PC 33) or stockpiles #8, 12, 13, 16, 17, 19 (PC 35).

In addition to its argument, MCCI submitted its "Backup for charges to PC 31" dated 19 October 2005.  This backup documentation shows worksheets for costs of $54,359 for disposal of 113 loads of chlordane materials in July and August 2005, and GBI costs of $501,571 for additional dust and erosion control and delays related to PC 31.

MCCI submitted a copy of contract modification A00016 and its Request for Information requesting clarification of the modification requirements.

MCCI submitted eight GBI force account reports for removal of the six stockpiles under A00016:  (a) Report C-2 in the amount of $13,282.47, (b) Report C-8 in the amount of $30,649.07, (c) Report C19 in the amount of $1,932.35, (d) Report C21 in the amount of $24,637.51, (e) Report C22 in the amount of $17,725.81, (f) Report C23 in the amount of $15,093.88, (g) Report C24 in the amount of $25,042.82, and (h) Report C30 in the amount of $13,970.12.  The total value of these force account reports is $142,334.03.

MCCI submitted a Revised Cost Proposal for PC 33 showing a worksheet estimating subcontractor costs of $84,061 and a total cost of $95,701.

MCCI submitted PC 35 showing a worksheet estimating subcontractor costs of $117,118 and a total cost of $133,336.  This also included an estimate from Kauai Environmental, Inc. (KEI) for $15,500.

MCCI submitted contract modification A00019.

### Line Item # 2 – Soil Sampling of truckloads as required by the ROICC and the approved
### sampling plan, air sampling, CIH monitoring etc.
### Kauai Environmental, Inc.
### ($137,028.93)

MCCI concedes that it did submit one invoice for work that was paid under A00019, i.e. KEI invoice 26-04 in the amount of $15,500.  MCCI contends this was a mistake and the invoice would have been withdrawn immediately had it been brought to MCCI's attention.  MCCI

argues that none of the other costs sought under Line Item #2 were previously paid under A00019 or A00014.

MCCI submitted a copy of KEI invoice 26-04 in connection with its argument on this issue.

### Line Item # 4 – Air sampling, soil sampling, CIH monitoring, management plans, etc.
### Kauai Environmental, Inc.
### ($30,344.39)

MCCI concedes that KEI invoices 26-30 and 26-40, both submitted as supporting documentation for this Line Item in the REA, each include the same 38 hours of work by Tony Barnard performed during May 2006. MCCI submitted a copy of KEI invoices 26-30 and 26-40 in connection with its argument on this issue. MCCI also submitted a Declaration of Walter Chun affirmatively stating that MCCI will remove the overstated amount from the certified claim.

MCCI acknowledges that it was contractually required to provide a full-time SSHO and that it did include costs for providing an SSHO in its REA. MCCI argues, however, that Walter Chun should have been allowed to address chlordane issues while serving as SSHO, so the additional charges for SSHO services by Tony Barnard are compensable. The Declaration of Walter Chun stated Mr. Chun's belief that it is appropriate to claim additional monies for SSHO services by Tony Barnard.

### Line Item # 12 – Attorney costs for both mods, and compliance with EPA regulations
### Alston Hunt Floyd & Ing
### ($126,262.00)

MCCI argues that it would have provided invoices as supporting documentation for the REA had it been asked, and MCCI did submit invoices as support for its MIO argument. MCCI further states that it has at least a colorable argument that it is entitled to these legal fees under FAR 31.205-33 and provides a copy of this FAR provision. In a footnote to its argument, MCCI concedes:

> Upon further review, Metcalf has discovered that some of these costs relate to issues other than chlordane. However, Metcalf maintains that they are still allowable costs under the applicable FAR provisions. (Symon letter of 6 June 2007, p. 7)

The Declaration of Walter Chun states "These costs are for legal advice that included advice given in connection with chlordane-related issues" and were not incurred for negotiations. Mr. Chun does not state whether the costs were exclusively for legal advice given in connection with chlordane-related issues.

### Line Item # 16 – Site electrical delay claim
### Precision Electric, Inc. (PEI)
### ($825,743.00)

MCCI argues the "additional compensation sought under Line Item #16 is *different* from the extra compensation paid under Mod A00003." (Symon letter of 6 June 2007, p. 8) MCCI provides a copy of A00003 and some of the backup documentation for Line Item #16 showing that PEI subtracted these hours from its calculation in the supporting documentation.

### Line Item # 21 – Increased costs due to delays and impact of delays
### Dorvin Leis
### ($82,308.00)

MCCI argues that the delay costs paid in A00022 specifically excluded costs associated with the REA and provides a copy of A00022 in support of its argument.

MCCI further argues that delay costs may be compensable despite the fact that the contractor may have been working throughout the time of the delay. MCCI provides a page from a government contracts treatise in support of its position

### Line Item # 25 – Impact cost of delays
### Goodfellow Bros. Inc.
### ($96,724.22)

MCCI argues that delay costs may be compensable despite the fact that both contractors were working throughout the time of the delay. MCCI provides a page from a government contracts treatise in support of its position.

### ADDITIONAL INQUIRY

In an effort to substantiate MCCI's arguments in the MIO, and consistent with MCCI's assertion that the SDO should conduct an independent inquiry into the REA, I traveled to the ROICC office to review the complete set of supporting documentation that MCCI provided in connection with the REA. I made copies of all supporting documentation for the REA and some correspondence related to A00019. Upon my return and review of these documents, the SDO provided a copy to MCCI on 25 July 2007 under cover letter indicating that these documents were made a part of the Administrative Record and allowing for submission of additional MIO.

### REQUEST FOR FACT-FINDING PROCEEDING

On 6 August 2007, MCCI faxed a letter indicating that it did not wish to submit additional MIO and requesting a formal fact-finding proceeding under DFARS Subpart 209.4 and Appendix H. By letter dated 9 August 2007, we requested that MCCI identify specific material facts over which it believes there is a genuine dispute. MCCI responded on 15 August 2007 with a letter purporting to identify seven material facts over which there is a genuine dispute.

The SDO reviewed MCCI's request and the Administrative Record, and determined that there is no genuine dispute over material fact that would require a fact-finding proceeding. The majority of MCCI's items request determinations of whether certain submissions were "wrongful" or "irresponsible." This is a request for a determination of law, not a determination of fact. With respect to one fact, whether MCCI submitted documents related to PC 33 and 35 as supporting documentation for Line Item #1, the SDO did not find there to be a genuine dispute based on the documents in the Administrative Record and the MIO. The SDO asked MCCI to clarify its position with respect to these documents, which are clearly marked in the Administrative Record. To date, MCCI has not responded to this request. With respect to the fact of whether PEI subtracted hours previously paid under A00003, the SDO agreed with MCCI that it had done so and therefore no fact-finding is needed. In addition, based upon the SDO's review of the Administrative Record and the MIO, the SDO narrowed the scope of the responsibility analysis to the following four items:

1. Submission of supporting documentation related to PC 33 and 35, and force account reports related to PC 35 in connection with Line Item #1 of the certified REA.
2. Submission of KEI invoice 26-04 in connection with Line Item #2, which MCCI concedes was previously paid under contract modification A00019.
3. Submission of KEI invoices 26-30 (dated 3 May 2006) and 26-40 (dated 15 June 2006), both of which include the same 38 hours of work by Tony Barnard performed during May 2006.
4. Submission of attorneys' fees and expenses in connection with Line Item #12 that MCCI concedes are unrelated to the object of the REA.

These items are addressed in detail in the analysis below.

LEGAL BASIS FOR DEBARMENT

As a preliminary matter, I will address MCCI's contention that the debarment is legally improper because "a debarment proposed pursuant to FAR 9.406-2(c) can only be proposed based on factors that have not already been covered by FAR 9.406-2(a) & (b)." (Symon letter of 6 June 2007, pp. 3-4) This assertion is contrary to case law and fundamentally flawed. Following MCCI's argument to its logical conclusion, no federal agency would ever be able to protect itself against non-responsible contractors who continually commit crimes against the federal government and may even admit to doing so, simply because no court has rendered judgment against them.

The Fourth Circuit has specifically addressed this issue in the context of a contractor's argument that it could not be debarred under FAR 9.406-2(c) for collusive bidding absent a conviction or civil judgment. Leitman v. McAusland, 934 F.2d 46, 50-51 (4th Cir. 1991). The contractor argued that the existence of a specific grounds for debarment under FAR 9.406-2(a)(2) prohibited debarment under FAR 9.406-2(c) for the same cause. The court disagreed, stating that the purpose of the alternate causes for debarment under FAR 9.406-2(a) & (c) is that subsection (a) allows for debarment without any opportunity for a hearing. Id. The court found that:

8

> This statutory structure and the language of the regulations clearly do not envision a requirement that a conviction or civil judgment be obtained before a debarment proceeding based on collusive bidding agreements be initiated

Id. The same reasoning applies in the current case. Had MCCI been able to identify a genuine dispute of material fact, it would have been entitled to a hearing because it has not been convicted and no civil judgment has been rendered. If MCCI had been subject to a conviction or civil judgment, it would have no entitlement to a hearing regardless of what facts it might dispute and regardless of what evidence it might present in support of its position. As the Court found in Leitman, this distinction in the rights of a contractor proposed for debarment is the purpose of the structure of the regulations.

## FINDINGS AND ANALYSIS OF THE ADMINISTRATIVE RECORD AND MIO

MCCI asks us to review the merits of the certified global claim and request for final decision. Regardless of the merits of the claim, our review is only concerned with the supporting documentation submitted by MCCI in connection with the REA and whether that information supports a cause for debarment. The certified claim is relevant to the analysis only to the extent that items that are double billed in the REA are included in the certified claim, and in consideration of items that MCCI affirmatively stated it would remove from the certified claim because of double billing. MCCI has said that it has conducted a thorough review of damages subsequent to the REA and that it is now represented by experienced counsel to guide it through the claim process. Despite all of these representations by MCCI, MCCI has not submitted a revised certified claim or withdrawn any damages from consideration subsequent to discovery of its "mistakes." Since May 2007 or earlier, MCCI has been aware of and has admitted to at least one item that is double billed under the certified claim, yet in the subsequent months it has not removed any items from consideration in the certified claim. Regardless of the value of those items, MCCI's failure to follow through with its affirmative statements to the government that it would remove double billed costs calls into question its responsibility as a government contractor.

MCCI makes a series of arguments centered around its characterization of an REA as a negotiating tool under the contract, and the idea that contractors should not be held to strict standards of care and accuracy in the context of an REA but rather only in a certified claim under the Contract Disputes Act. The argument fails to acknowledge the fundamental principle that contractors may not submit requests for payment for items that have previously been paid in any context, be it an REA or certified claim or otherwise. Terry Metcalf certified the REA as "made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief."

The following analysis of specific Line Items in the REA and supporting documentation is made from the standpoint of a determination whether there is evidence of fraud, falsification, or other indications of lack of responsibility. Determinations of whether such items are compensable or not are left to the contracting officer.

### Line Item # 1 – Remove 6 stockpiles as directed in Mod 00016
### Goodfellow Bros. Inc.
### ($453,624.00)

In its "Revised Worksheet for REA 16 & 17/ Itemized Back up for # 1 – 12" dated 27 October 2006, MCCI submitted several hundred pages of documents as support for Line Item #1 under a cover sheet labeled "FORCED ACCOUNT TO REMOVE 6 STOCKPILES AS DIRECTED IN MOD 00016." These documents include a series of GBI Force Account Reports dated 12/29/05 - 1/17/06 for the haul out of 268 loads. The total of this series of Force Account Reports, as indicated on the final report dated 1/17/06, is $107,510.70. The report numbers and GBI job numbers on all of these invoices are blacked out. In addition to the Reports, MCCI submitted 80 pages of documents, including a spreadsheet summary of the removal of 268 loads of stockpiled soil as part of PC 35 during 1/4/06-1/17/06, and several dozen Pineridge Farms, Inc. truck trip tickets. These spreadsheet summary is clearly labeled as "PC 35" and the stockpiles removed, as identified on the spreadsheet summary, are those covered by PC 35. The dates and number of loads from the PC 35 spreadsheet summary and trip tickets match the GBI Force Account Reports dated 12/29/05 – 1/17/06 totaling $107,510.70. Therefore, these GBI Force Account Reports identify charges associated with PC 35.

Following the reports dated 12/29/05 – 1/17/06 are the GBI Force Account Reports for the PC 31 haul out of 860 truckloads on 10/27/05 - 12/17/05. The total value of the PC 31 reports is $346,112.53. In addition to the reports, MCCI submitted 83 pages of documents, including a spreadsheet summary of the removal of 860 loads of stockpiled soil as part of PC 31 during 11/1/05 – 12/17/05 and several dozen Pineridge Farms, Inc. truck trip tickets. The dates and number of loads from the PC 31 spreadsheet summary and trip tickets match the GBI Force Accounts dated 10/27/05 – 12/17/05 totaling $346,112.53. The dates of work performed on PC 31 do not overlap with the work performed on PC 35, and the stockpiles removed under PC 31 do not overlap with the work performed on PC 35.

MCCI's revised REA spreadsheet requests a total of $453,624 for Line Item #1. Note that this number is the sum of the PC 35 reports ($107,511) and the PC 31 reports ($346,113), with each series of reports rounded to the nearest dollar. It is clear based on the Administrative Record that MCCI did submit invoices related to PC 35 in connection with Line Item #1 and that MCCI did include these invoices in its calculations. Further, MCCI again requests $453,624 for "Remove 6 stockpiles as directed in Mod 00016 (GBI)" in its certified claim.

### Line Item # 2 – Soil Sampling of truckloads as required by the ROICC and the approved
### sampling plan, air sampling, CIH monitoring etc.
### Kauai Environmental, Inc.
### ($137,028.93)

MCCI concedes that it submitted one invoice for work that was paid under A00019, i.e. KEI invoice 26-04 in the amount of $15,500. Absent additional information regarding the remaining invoices submitted in connection with Line Item #2, the remaining invoices are removed from further consideration as part of this action.

**Line Item # 4 – Air sampling, soil sampling, CIH monitoring, management plans, etc.**
**Kauai Environmental, Inc.**
**($30,344.39)**

MCCI concedes that KEI invoices 26-30 and 26-40, both submitted as supporting documentation for this Line Item in the REA, each include the same 38 hours of work by Tony Barnard performed during May 2006. MCCI affirmatively represented both in its argument and in the Declaration of Walter Chun it would remove the overstated amount from the certified claim. To date, MCCI has not removed these monies from its certified claim.

The determination of whether additional compensation for SSHO services may be submitted is an issue of contract entitlement, and absent additional information, it is being removed from further consideration under this action.

**Line Item # 12 – Attorney costs for both mods, and compliance with EPA regulations**
**Alston Hunt Floyd & Ing**
**($126,262.00)**

MCCI concedes that it submitted costs unrelated to chlordane under this Line Item. Further, MCCI admits that it did not submit any supporting documentation to the contracting officer that would have allowed her to identify this discrepancy. Although an REA may be open to negotiation, the contractor has a responsibility to accurately characterize the compensation it requests, and Terry Metcalf did in fact certify the accuracy and completeness of the REA.

**Line Item # 16 – Site electrical delay claim**
**Precision Electric, Inc. (PEI)**
**($825,743.00)**

The SDO found that PEI did in fact subtract hours paid under A00003 from its supporting documentation. Therefore, this item is removed from further consideration as part of this action.

**Line Item # 21 – Increased costs due to delays and impact of delays**
**Dorvin Leis**
**($82,308.00)**

**AND**

**Line Item # 25 – Impact cost of delays**
**Goodfellow Bros. Inc.**
**($96,724.22)**

MCCI's arguments that these type of costs can be submitted in an REA in good faith and may be compensable under certain circumstances is colorable. Based upon the absence of additional information regarding the specific circumstances of these costs under this REA that would be necessary to draw a conclusion as to how they impact MCCI's present responsibility, they are removed from further consideration as part of this action.

<u>DEBARMENT ANALYSIS</u>

The Federal Acquisition Regulation (FAR) provides, in pertinent part, that "[a]gencies shall solicit offers from, award contracts to, and consent to subcontracts with responsible contractors only." FAR 9.402(a). The FAR further provides that "[d]ebarment and suspension are discretionary actions that, taken in accordance with this subpart, are appropriate means to effectuate this policy." <u>Id.</u> The FAR also mandates that in order to "be determined responsible, a prospective contractor must . . . [h]ave a satisfactory record of integrity and business ethics." FAR 9.104-1.

In order to effectuate these policies, the FAR provides that a contractor may be debarred for any of those causes stated in FAR 9.406-2. That regulation provides, in pertinent part, as follows:

The debarring official may debar –

(c) A contractor or subcontractor based on any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor or subcontractor.

The information contained in the Administrative Record provides the requisite evidence to debar MCCI and Terry Metcalf for the cause stated in FAR 9.406-2(c). MCCI submitted numerous requests for payments that had already been paid under other contract actions. Doing so constitutes double billing for work already paid and/or required by the contract. Terry Metcalf signed the certification and REA, representing that the REA was submitted in good faith, accurate, and complete. Requesting compensation under a federal government contract for work that a contractor is already required to perform and/or has already been paid to perform, constitutes double billing. Whether the double billing and unrelated costs contained in the REA were the result of fraud by MCCI and Terry Metcalf, or the result of Terry Metcalf's inability to comprehend and adhere to applicable law, MCCI's REA and its pursuit of costs for which it had already been paid calls into question its responsibility, honesty, and credibility as a contractor. Furthermore, despite both the ROICC and the SDO highlighting these instances to MCCI in January 2007 and May 2007 respectively, and despite MCCI's affirmative representations that it would withdraw at least one of these dual charges from its certified claim, MCCI has failed to do so to date. No contracting officer could rely on documents submitted by MCCI or Mr. Metcalf to accurately reflect their work or a good faith representation of entitlement, or to comply with applicable law. Conduct of this nature undermines the Government acquisition process and constitutes a cause for debarment so serious that it affects MCCI and Terry Metcalf's present responsibility as contractors.

The FAR also requires that "the seriousness of the contractor's acts or omissions and any remedial measures or mitigating factors should be considered in making any debarment decision." FAR 9.406-1(a). Mitigating factors include:

(1) Whether the contractor had effective standards of conduct and internal control systems in place at the time of the activity which constitutes cause for debarment or had adopted

such procedures prior to any Government investigation of the activity cited as a cause for debarment.

MCCI has not provided any information relating to its standards of conduct or internal control systems.

(2) Whether the contractor brought the activity cited as a cause for debarment to the attention of the appropriate Government agency in a timely manner.

MCCI did not bring any of these items to the attention of the government. Rather, MCCI contends that it was not even aware of the instances of inappropriate items included in its REA until the government specifically pointed it out to MCCI in the ROICC Determination in January 2007 and in the proposed debarment action on 1 May 2007.

(3) Whether the contractor has fully investigated the circumstances surrounding the cause for debarment and, if so, made the result of the investigation available to the debarring official.

MCCI states that it has conducted a thorough review of the REA and the costs claimed, and that it will remove inappropriate costs from the certified claim. However, MCCI did not provide a detailed analysis nor did it make any investigative results or reports available to the SDO.

(4) Whether the contractor cooperated fully with Government agencies during the investigation and any court or administrative action.

MCCI states that it has cooperated fully with the government. However, MCCI has not followed through on its representations to the SDO in that it has not provided a revised certified claim or otherwise removed costs from consideration in the certified claim. MCCI has repeatedly stated its intent to do so, but it has not.

(5) Whether the contractor has paid or has agreed to pay all criminal, civil, and administrative liability for the improper activity, including any investigative or administrative costs incurred by the Government, and has made or agreed to make full restitution.

MCCI has not offered or agreed to make any such payments to the government.

(6) Whether the contractor has taken appropriate disciplinary action against the individuals responsible for the activity which constitutes cause for debarment.

MCCI has not provided any information to suggest that it has taken or intends to take any disciplinary action.

(7) Whether the contractor has implemented or agreed to implement remedial measures, including any identified by the Government.

MCCI has not provided any information to suggest that it has implemented remedial measures, nor has it agreed to implement any remedial measures. MCCI has only stated that it has hired experienced outside counsel to represent it in on this contract.

(8) Whether the contractor has instituted or agreed to institute new or revised review and control procedures and ethics training programs.

MCCI has not provided any information to suggest that it has instituted or revised any such procedures and programs.

(9) Whether the contractor has had adequate time to eliminate the circumstances within the contractor's organization that led to the cause for debarment.

MCCI has been the prime contractor on this contract since its award, and has been on notice of the issues giving rise to this action since at least January 2007, upon receipt of the ROICC Determination. MCCI was again put on notice of these issues when it received the Notice of Proposed Debarment in May 2007. MCCI subsequently conceded some of the improper charges, but to date has failed to remove them from consideration in the certified claim and has only pointed to its retention of legal counsel as a reason that such dual charges will not be submitted again on this contract.

(10) Whether the contractor's management recognizes and understands the seriousness of the misconduct giving rise to the cause for debarment and has implemented programs to prevent recurrence.

MCCI has not provided any information to suggest that it understands the seriousness of its misconduct. Rather, MCCI argues that its submission of dual charges were mistakes and that it should not be held accountable for such mistakes in the context of an REA.

MCCI offers as mitigation the fact that it continued contract performance despite ongoing disagreement with the government, and its affirmative representation that it is a responsible contractor. Given that MCCI has not admitted the full scope of its misconduct, has not followed through on its representations that it would correct the errors it concedes, and has provided little to no information that could be considered as mitigation or remedial measures, the Government needs to be protected from MCCI and Terry Metcalf by imposition of a period of debarment.

## CONCLUSION

The Administrative Record contains adequate evidence to support the debarment of MCCI and Terry Metcalf under FAR 9.406-2(c) because their conduct in this matter affects their present responsibility as contractors. The FAR requires that any period of debarment be "commensurate with the seriousness of the cause," and provides that "[g]enerally debarment should not exceed three years." FAR 9.406-4(a)(1). Considering all of the factors in this case, and assuming that MCCI and Mr. Metcalf will follow through and correct the improper costs in MCCI's certified claim within a reasonable time, I recommend an eighteen-month period of debarment. With credit for the time MCCI and Mr. Metcalf have already been excluded from

contracting because of their proposed for debarment status, the eighteen-month period of debarment will terminate on 31 October 2008.

RECOMMENDATION

That you sign the enclosed letter notifying MCCI and Terry Metcalf that the Department of the Navy is placing their names in the "Excluded Parties List System" as being debarred until 31 October 2008.

KRISTIN L. BECKER
Associate Counsel
Office of the General Counsel (Acquisition Integrity)

EXHIBIT 2



**DEPARTMENT OF THE NAVY**
OFFICE OF THE GENERAL COUNSEL
720 KENNON STREET SE RM 214
WASHINGTON NAVY YARD DC 20374-5012

23 Aug 2007

<u>VIA FACSIMILE</u>

Robert J. Symon, Esq.
Bradley Arant Rose & White LLP
1133 Connecticut Avenue, N.W.
12th Floor
Washington, DC 20036

RE:    REQUEST FOR FACT-FINDING PROCEEDING ON PROPOSED
DEBARMENT OF METCALF CONSTRUCTION COMPANY, INC. AND
TERRY METCALF

Dear Mr. Symon:

This is in response to your letter dated 15 August 2007 listing seven issues for which Metcalf Construction Company, Inc. (MCCI) and Terry Metcalf are requesting a fact-finding proceeding. The majority of issues identified in your letter contain requests for legal determinations rather than determinations of fact. Fact-finding proceedings under FAR 9.406 are only available for the determination of facts, and we will not conduct hearings on legal issues. Therefore, I am denying all requests for legal analysis or determination through a fact-finding proceeding.

With respect to the inclusion of invoices related to Proposed Contract modifications (PC) #33 and #35, I direct you to the copy of MCCI's supporting documentation for the REA delivered to you on 25 July 2007 as well as the attached declaration, which I am making a part of the administrative record. Please clarify whether MCCI's contention is that it never submitted these documents or whether there is some other reason underlying your assertion that "Metcalf did *not* submit PCs 33 and 35 and related invoices in support of Line Items 1 and 2." (Symon letter dated 6 June 2007) Absent further information, I do not find there to be a genuine dispute over the fact of whether MCCI submitted these documents because they are part of the Government's file, clearly marked as having been submitted as supporting documentation for the REA.

With respect to PEI's pass-through claim, after reviewing the administrative record and your matters in opposition, I agree that MCCI did in fact subtract the PEI labor hours previously paid under modification A00003 from its REA submittal. Any analysis of whether submission of supporting documents was "wrongful or irresponsible" is a legal determination and therefore not appropriate for fact-finding.

Having reviewed the administrative record, your matters in opposition, and your requests for fact-finding, I am narrowing the scope of my responsibility analysis to the following matters:

1. Submission of supporting documentation related to PC #33 and #35, and force account reports related to PC #35 in connection with Line Item #1 of the certified REA.
2. Submission of KEI invoice 26-04 in connection with Line Item #2, which MCCI concedes was previously paid under contract modification A00019.
3. Submission of KEI invoices 26-30 (dated 3 May 2006) and 26-40 (dated 15 June 2006), both of which include the same 38 hours of work by Tony Barnard performed during May 2006.
4. Submission of attorneys' fees and expenses in connection with Line Item #12 that MCCI concedes are unrelated to the object of the REA.

You may contact Kristin Becker at 202.685.7266 to clarify your position on the PC #33 and PC #35 documentation or with any questions.

Sincerely,

MARK O. WILKOFF
Suspending and Debarring Official
Department of the Navy

2

# Declaration of Orlino R. Peralta

1.    I, Orlino R. Peralta, am a Civil Engineer employed by the Department of the Navy, Naval Facilities Engineering Command Hawaii (NAVFAC Hawaii) and have worked as a construction management engineer (CME) with the Navy since 1996.

2.    I am currently a CME assigned to the Resident Officer in Charge of Construction at Kaneohe Bay (ROICC Kaneohe Bay) and, as part of my duties, oversee the CME responsibilities for contract no. N62742-02-C-1313, FY01 Project H-570 and FY02 Project H-571 (188 units) and FY03 Projects H-571 and H-563 (24 units), Replacement of Family Housing Quarters at Marine Corps Base Hawaii, Kaneohe Bay, Hawaii. This contract is commonly known as the "212 family housing contract" at Kaneohe Bay.

3.    On or about September 20, 2006, the ROICC Kaneohe Bay office received a certified request for equitable adjustment (REA) from Metcalf Construction Company, Inc. (MCCI) seeking $5,214,760.60 relating to two contract modifications, contract modifications A00016 (involving the removal of chlordane-contaminated soil in stockpiles #10, 11, 14, 15, 18 and 20 at the project site) and A00017.

4.    The REA included several hundred pages of supporting documentation in connection with, and as justification for, the REA.

5.    MCCI requested $453,624 in Line Item #1 of its Work Sheet for Chlordane Contaminated Soil Removal of Six Stockpiles. Line Item #1 indicates that the Scope of Work is "Remove 6 stockpiles as directed in Mod 00016," performed by GBI, with an Estimated Quantity of 9305 cu yds. As part of MCCI's supporting documentation, MCCI submitted:

    a.    7 Goodfellow Bros. Inc. (GBI) Force Account Reports (Reports), most with attachments and Foreman's Daily Reports. Several of these Reports are labeled Haul Out Area 2A (2574 C.Y.) These Reports are dated 12/29/05 – 1/17/06 for 268 loads totaling $107,510.70. The Report No. and GBI Job No. on each report are blacked out.

    b.    34 GBI Force Account Reports (Reports) for 9305 Haul Out, most with attachments and Foreman's Daily Reports. These Reports are dated 10/27/05 – 12/17/05 for 860 loads totaling $346,112.53. These Reports appear to be Reports No. C-1 through C-22 and C-24 through C-35, and show GBI Job No 6404.

    c.    A TRANSMITTAL/REVIEW/APPROVAL sheet signed by Kathy Ashley, QC Manager, dated 4/17/06 showing 4 enclosures – Backup hauling tickets for PC [proposed contract change] 31, backup hauling tickets for PC 33, Backup hauling tickets for PC 35, and Waste Management Invoices. The transmittal sheet is followed by: (1) GBI Transmittal #137 dated 4/14/06, (2) Waimanalo Gulch Sanitary Landfill (WGSL) Invoice 1962, (3) WGSL Invoice 1966, (4) 83 pages of documents, including a spreadsheet summary of the removal of 860 loads of stockpiled soil as part of PC # 31 during 11/1/05 – 12/17/05 and several dozen Pineridge Farms, Inc. truck trip tickets, (5) 74 pages of documents, including a spreadsheet summary of the removal of 163 loads of stockpiled soil as part of PC # 33 during 12/14/05 – 12/17/05 and

several dozen Pineridge Farms, Inc. truck trip tickets; and (6) 80 pages of documents, including a spreadsheet summary of the removal of 268 loads of stockpiled soil as part of PC #35 during 1/4/06-1/17/06, and several dozen Pineridge Farms, Inc. truck trip tickets.

6.    PC #33 and #35 have nothing to do with contract modifications A00016 and A00017.

7.    PC #33 and #35 were part of a bilateral contract modification number A00019 wherein the Government paid MCCI $377,435.00 under this modification.

8.    As a result of the Government's determination that PC #33 and #35 had nothing to do with contract modifications A00016 and A00017 and, in fact, MCCI had already received payment for PC #33 and #35, the Government denied this line item in MCCI's certified REA except to the extent that MCCI hauled out 860 truck loads of soil in connection with PC #31, which is 160 truckloads more than the Government estimate of 700 truckloads used in contract modification A00016.

I declare under penalty of perjury that the foregoing is true and correct.

8/23/07

Orlino R. Peralta, P. E.
Construction Management Engineer
ROICC Kaneohe Bay
NAVFAC Hawaii